UNITED STATES BANKRUPTCY COURT
DISTRICT OF MAINE

| | |
|---|---|
| In re:<br><br>**32 THOMAS STREET, LLC,**<br><br>Debtor. | **Chapter 11**<br><br>Case No. 19-20054 |

**DECLARATION OF FRED LAMONTAGNE IN SUPPORT OF DEBTOR'S PETITION AND FIRST DAY MOTIONS**

I, Fred LaMontagne, declare as follows under penalty of perjury:

**BACKGROUND**

1.  I play a critical role in the business operations of 32 Thomas Street, LLC (the "Debtor"). I am familiar with Debtor's day-to-day operations, businesses, and financial affairs. I am authorized to submit this Declaration in support of Debtor's chapter 11 petition and the first day pleadings described herein.

2.  I have been employed by the Debtor since its incorporation in 2012. I have seen the Debtor's real estate project from inception, through construction financing for the project, to present day.

3.  On February 15, 2019 (the "Petition Date"), Debtor filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Maine (the "Bankruptcy Court").

4.  On February 15, 2019, the following pleadings were filed on behalf of the Debtor (collectively, the "First Day Motions"):

    a.  Debtor's Motion for Order (I) Authorizing the Debtor to (A) Obtain Postpetition Financing on an Interim Basis and (B) Grant the Postpetition Lender a Subordinate Lien on the Debtor's Assets, (II) Modifying the Automatic Stay, and (III) Scheduling a Final Hearing Authorizing the

1

        Financing on a Final Basis Pursuant to Bankruptcy Rule 4001 (the "DIP Motion");

b.    Debtor's Motion for Authority To: (A) Pay Pre-Petition Employee Wages, Salaries, and Related Payroll Obligations; (B) Make Payments For Which Payroll Deductions are Made; and (C) Direct All Financial Institutions To Honor All Related Payment Requests (the "Payroll Motion"); and

c.    Joint Motion for Expedited Hearings and Approval of Limited Notice and Shortened Objection Period with Respect to Certain First Day Motions (the "Motion for Expedited Hearings").

5.    This Declaration is submitted in support of these First Day Motions, which are described in greater detail below.

6.    All facts set forth herein are based on my personal knowledge, on information supplied to me by others within Debtor's organization, upon my review of relevant documents, or on my opinion based upon my experience and knowledge of Debtor's operations, financial condition, and present liquidity needs. If I were called to testify, I could and would testify competently to the facts set forth herein.

7.    Part I of this Declaration describes the business operations and background of Debtor. Part II sets forth facts relevant to each of the First Day Motions.

## DESCRIPTION OF DEBTOR'S BUSINESS AND BACKGROUND

8.    The Debtor owns a condominium project located at 32 Thomas Street, Portland, Maine 04102 (the "Project"). The Debtor purchased the underlying real estate in 2011, which included a historical church, formerly known as the Willison-West United Church of Christ. After a family event changed the purpose for the Project, the Debtor's intent for the project became to convert the church into premiere condominium units in Portland's burgeoning west end neighborhood.

9.    The Project has been in development since 2011. I have overseen that development. Since April 2012, I have assisted the Debtor in navigating the Project through the

City of Portland's zoning process, and have facilitated extensive negotiations with community stakeholders regarding the intended conversion of the church into residential housing.

10.  The construction phase of the project is complete and the individual condominium units are currently on the market. Last year, the Debtor faced a financial setback when a water pipe burst. While ultimately the Debtor's insurance covered the loss, it caused a setback in the Debtor's ability to market the units.

11.  After consultation with the Debtor's advisors, I believe that the market for the condominiums individually and—more recently—the Project has a whole, looks promising, the Debtor is seeking bankruptcy protection to avoid a scheduled foreclosure auction scheduled for February 15, 2019.

12.  The Debtor currently has approximately $504.30 in its accounts as of the filing on the chapter 11 petition, which—as set forth in the Budget attached to the DIP Motion—is inadequate cash on hand to pay its normal operating expenses.

## THE FIRST DAY MOTIONS[1]

12.  I have reviewed each of the First Day Motions, including the exhibits thereto (as applicable), and I believe that the relief sought in each of the First Day Motions is necessary if the Debtor is to successfully exit from chapter 11 protection. Ultimately, I believe that the First Day Motions will be critical to the Debtor's ability to maximize value for the benefit of their creditors.

**A.  DIP Motion**

13.  Prior to the Petition Date, the Debtor entered into certain loan agreements with certain lenders. In order to secure the indebtedness owed to the various lenders under the loan

---

[1] Capitalized terms used, but not defined, in this Declaration shall have the meanings ascribed to such terms in the respective First Day Motion.

3

agreements, the Debtor granted such lenders certain security interests in the assets of the Debtor. I make no assurances as to the extent of validity of those security interests, or the amounts asserted to be outstanding.

### i.  *2015 Indebtedness*

14.    On or about December 31, 2015, the Debtor and Coastal Realty Capital, LLC, d/b/a Maine Capital Group ("Coastal") entered into certain a loan agreement and the Debtor executed a promissory note pursuant to which the Debtor borrowed the principal amount of $1,400,000 from Coastal (the "2015 Indebtedness").  On January 1, 2017, the parties executed a modification agreement decreasing the principal amount of the 2015 Indebtedness to $1,000,000. By written agreement, the principal amount of the 2015 Indebtedness was later reduced to $1,000,000. In connection with the loan, the Debtor executed the following security documents:

(a) Mortgage, Security Agreement and Financing Statement dated December 31, 2015 recorded at the Cumberland County Registry of Deeds (the "Registry") in Book 32872, Page 309, as modified on by a Modification of Mortgage dated March 23, 2017 and recorded at the Registry in Book 33899, Page 180 (the "2015 Mortgage"); and

(b) Collateral Assignment of Leases and Rents dated December 31, 2015 recorded in the Registry in Book 32872, Page 336 (the "2015 Collateral Assignment," and together with the 2015 Mortgage and all other loan documents related to the 2015 Indebtedness, "2015 Loan Documents")

15.    On September 23, 2018, the 2015 Indebtedness matured under the terms of the 2015 Loan Documents.

16.    On October 8, 2018, the Debtor and Coastal entered into a forbearance agreement relating to the 2015 Indebtedness.

17.    As of the Petition Date, the aggregate outstanding amount under the 2015 Loan Documents was approximately $1,301,348.

### ii. *2017 Indebtedness*

18. On or about March 23, 2017, the Debtor and Camden National Bank ("Camden") entered into certain a loan agreement and the Debtor executed a promissory note pursuant to which the Debtor borrowed the principal amount of $1,400,000 from Camden (the "2017 Indebtedness"). In connection with the loan, the Debtor executed the following security documents:

(a) Mortgage and Security Agreement dated March 23, 2017 recorded at the Registry in Book 33899, Page 150 (the "2017 Mortgage");

(b) Collateral Assignment of Special Declarant Rights dated March 23, 2017 recorded in the Registry in Book 33899, Page 177 (the "2017 Collateral Assignment");

(c) Commercial Security Agreement dated March 23, 2017 and a UCC financing statement filed with Maine Secretary of State, Filing Number 20170324109000060-55 (the "2017 Security Agreement" and together with the 2017 Mortgage, 2017 Collateral Assignment, and all other loan documents related to the 2017 Indebtedness, "2017 Loan Documents").

19. On or about October 4, 2018, Camden assigned the 2017 Loan Documents to Marc Powers, Vandelay Enterprises, LLC, DiMillo's Old Port Marina, Inc., and Coastal.

20. On September 23, 2018, the 2017 Indebtedness matured under the terms of the 2017 Loan Documents.

21. On October 8, 2018, the Debtor and Coastal entered into a forbearance agreement relating to the 2017 Indebtedness.

22. As of the Petition Date, the asserted, aggregate outstanding amount under the 2017 Loan Documents was approximately $1,729,023.

### iii. *Necessity for DIP Loan*

23. The Debtor requires immediate access to additional funds in order to pay certain necessary (although modest in amount) ordinary business expenses. The principal of the

company, Francis N.T. Monsour, has agreed to the loan the Debtor $50,000 on the terms described in full on the DIP Promissory Note attached to the DIP Motion to fund those expenses.

24. Without the DIP Loan, and the inability to use the modest amount of cash (which I understand may constitute cash collateral of one or more of the lenders), the Debtor would become unable to pay general operating expenses immediately. Those expenses include, without limitation, my fees, utilities and the various other items reflected in the Budget. Upon the Debtor's inability to pay its general operating expenses, the Debtor would have to immediately liquidate, resulting in the destruction of substantial value that would otherwise inure to the benefit of the Debtor's stakeholders. The credit provided under the DIP Loan will enable the Debtor to pay me to fulfill the various tasks required to protect the value of the Project, and otherwise operate its business during the pendency of this case, thereby preserving and enhancing the value of its estate for the benefit of all parties in interest.

### iv. DIP Loan Marketing

25. Up until very recently, the Debtor had a purchaser for the Project that would have obviated the need for this chapter 11 filing. But in the days leading up to the Petition Date, that purchaser indicated that it would prefer to wait to see if it could get a better price at the auction scheduled for February 15. And so the Debtor immediately began making preparations to file for chapter 11 protection to protect the value that it feared would be destroyed at a bank-run auction without the benefit of the counsel and marketing efforts of the Debtor's professionals.

26. During those days, I was unable to find a lender willing to provide unsecured credit for the Debtor to operate in chapter 11. This would not have been a surprising outcome to me even if the Debtor were not preparing to file for chapter 11. But given that prospective lenders would have been lending to a chapter 11 debtor, this was even less surprising to me. Ultimately, given the time constraints and the economic realities of the Debtor's business

operations, I believe that additional efforts to obtain unsecured credit would have been unsuccessful, and would merely have detracted from the limited time that I had to work with the Debtor's professionals to prepare for the chapter 11 filing.

27. The Debtor needs the DIP Loan to enable it to have adequate time and resources to conduct a robust sale process for its assets (while preserving the option of reorganization). I believe, after consultation with the Debtor's advisors, that a sale process is the best way to maximize value for the Debtor's constituents and obtaining the DIP Loan to enable an orderly sale process is in the best interests of the Debtor's estate.

### v. *Good Faith of DIP Lender*

28. Monsour has offered to lend the necessary working capital for the Debtor to pay its operating costs during its chapter 11 case on the condition that the DIP Loan is secured is by a subordinated lien on the project. Subordinated secured credit is the best financing available to the Debtor at this time. I believe that Monsour's offer to fund operations on a subordinated basis lends credibility to his belief that there is substantial value in the Project's assets beyond the value of the bank debt, and indicates his good faith efforts to recover as much value as possible for the benefit of the estate.

### vi. *Interim Borrowing*

29. Authorization to enter into the DIP Loan as requested herein is necessary on an interim basis in order to avoid immediate and irreparable harm to the Debtor. Absent immediate access to additional funds, the Debtor would become unable to pay its employee and utility providers, and providers of other essential operational services within a very short time. As set forth above, the failure of the Debtor to make any of these payments would result in an inability to continue operations as a going concern and would result in an immediate need to liquidate the Debtor's assets. The interim borrowing proposed in this Motion will, on the other hand, permit

the Debtor to operate as a going concern in order to preserve the value of its assets to maximize value for constituents and meet its obligations as a debtor in possession.

### B. Payroll Motion

30. As of the Petition Date, I am owed approximately $1650.00 for wages incurred in the week leading up to the Petition Date, during which time I assisted counsel to the Debtor in preparing for this filing. I am also owed substantial wages for past work. If I am not paid at least fees for this most recent week, it will jeopardize my ability to pay my own expenses, and I may have to seek other employ in order to cover those expenses. Seeking other employ would in turn jeopardize the value of the Project, given that I am the sole representative responsible for its upkeep.

I certify under penalty of perjury that the foregoing is true and correct.

Dated: February 14, 2019

_____
Fred LaMontagne